IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOSHUA STEWART, an individual, )
       Plaintiff, )
        )
       vs ) Civil Action 09-725
        )
NEW CASTLE SCHOOL DISTRICT, )
       Defendant. )

REPORT AND RECOMMENDATION

I. <u>Recommendation</u>:

It is respectfully recommended that the defendant's motion for summary judgment (Document No. 42) be granted.

II. <u>Report</u>:

Presently before the Court is a motion for summary judgment submitted by the defendant, New Castle School District (the "School District"). For reasons discussed below, the defendant's motion for summary judgment should be granted.

Plaintiff Joshua Stewart, an adult African American male, complains that the School District discriminated against him because of his race in violation of Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, et seq. ("Title VI").[1] As alleged in his third amended complaint, the plaintiff contends that during the school year of 2006-2007, when he was a sophomore at New Castle Area High School (the "High School"), the defendant falsely accused him of providing narcotics to a student in school; that it then conducted a flawed and biased investigation into the matter to ensure he would be accused of the misconduct because of

---

[1] In pertinent part, Title VI provides that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI. 42 U.S.C. § 2000d.

his race; and that based on its investigation, the School District expelled him from school without taking similar action against non-minority students also accused of the act.

The record shows that on February 27, 2007, John Sarandrea, the High School's Principal, first became aware of a medical problem in the High School when a phone call from a teacher's classroom was received in the office (Defendant's Concise Statement of Material Facts ["CSMF"] at ¶ 12 and Plaintiff's response thereto). Sarandrea immediately reported to the classroom, where he found a student identified as "E.M." lying on the floor.[2] At that time, Sarandrea did not know that E.M. had overdosed on prescription drugs (Id. at ¶¶ 14, 18). The School Nurse began CPR, and Sarandrea escorted the other students in the class to the auditorium. A 911 call was made from the High School (Id. at ¶¶ 13-14). EMS personnel arrived at the school and removed E.M. from the building, whereupon she was life-flighted to Pittsburgh (Id. at ¶¶ 16-17).

Sarandrea and other administrators began an investigation into the matter. Initially, Sarandrea spoke with some teachers, asking if they observed anything about E.M. that day; information was also received from several students (Id. at ¶¶ 19-22). For instance, it was reported that E.M. was seen staggering and walking into the wrong classroom. Sarandrea also received information that the incident began in Ms. Blakely's classroom (Id. at ¶¶ 24-25).

As a result, Sarandrea looked at a seating chart from Ms. Blakely's class and selected three students to talk to about the incident, all of whom sat in close proximity to EM and were friends or acquaintances with her, namely: B.R., E.P. and the plaintiff (Id. at ¶¶ 26, 29, 30). Upon meeting with the students, Sarandrea told them they were not in trouble, and that he was

---

[2] "E.M." was identified by name in the third amended complaint. However, since she was a minor, the Court will refer to her by initials in accordance with Local Rule 5.2(D)(2).

trying to gather information about the incident (Id. at ¶ 33).

When Sarandrea questioned the three students, Police Sergeant Cynthia Eve of the New Castle Police Department was present; Sergeant Eve arrived at the school in response to the 911 call, and she also questioned the students as part of her investigation (Id. at ¶¶ 23, 31, 40). As gleaned from their discussion, B.R., E.P. and the plaintiff knew that E.M. had left the classroom and returned, having taken "whatever it was that she took." That is because E.M. told them she had taken some pills. E.P. stated that E.M. had ingested Oxycontin, while the plaintiff said she had taken Advil (Id. at ¶ 34; Defendant's appendix in support of its motion at pp. A. 36-37).

During the questioning, E.P. and B.R. told Sarandrea they did not know where E.M. got the pills. However, it was later revealed that they lied about that, because the plaintiff was sitting right behind them during Sarandrea's questioning. Following their discussion, Sarandrea let the students go home. After that, the plaintiff never returned to the High School, and he never spoke to Sarandrea again (Defendants' CSMF at ¶¶ 39, 43-44 and Plaintiff's response thereto).

Principal Sarandrea testified that on February 27, he searched E.M.'s purse, then placed it in his desk, after which the police came to get it. According to the New Castle Police Department Property Report dated February 27, 2007, Sergeant Eve logged E.M.'s purse and thirteen (13) small white pills into the Police Department's Juvenile Record (Plaintiff's Counter-statement of Material Facts ["CMF"] at ¶¶ 99-101 and Defendant's response thereto). While conducting her investigation into the matter, Sergeant Eve interviewed several students who came to the High School office and told her what they knew. These students included J.B. and a confidential informant. When Eve spoke with students, either their parents or school officials were present (Id. at ¶¶ 90, 92-93).

On February 27, Sergeant Eve received information from the confidential informant

3

which was used to get a search warrant to check the plaintiff's house. The confidential informant told Eve that the plaintiff sold Oxycontin to E.M. two weeks before the incident. When Sergeant Eve interviewed the plaintiff after obtaining the search warrant, the plaintiff admitted giving pills to E.M. a week earlier (Defendants' CSMF at ¶¶ 47, 48, 52 and Plaintiff's response thereto).

The confidential informant also reported that he/she observed the plaintiff and A.M. arguing, as A.M. had given E.M. some of the plaintiff's pills without receiving payment for them. During Eve's investigation, J.B. confirmed that the plaintiff and A.M. argued about how the plaintiff was going to get his money, after A.M. sold pills to E.M. for more money (Plaintiff's CMF at ¶¶ 94-95 and Defendant's response thereto).

A.M. was a white, 10th grade student at the High School. Sarandrea was aware that A.M. and the plaintiff reportedly had a verbal confrontation, at which time the plaintiff demanded that A.M. give him his money (Id. at ¶¶ 111, 115). Thus, A.M. was interviewed by Robert Razzano, an Assistant Principal (Defendant's CSMF at ¶ 57 and Plaintiff's response thereto). Razzano interviewed A.M. because he had a close relationship with her, having worked through some personal matters with her in the past. Razzano informed Sarandrea that A.M. had previously purchased or been given drugs by the plaintiff, but Sarandrea never questioned A.M. (Plaintiff's CMF at ¶¶ 116-118 and Defendant's response thereto).

Significantly, A.M. denied having a confrontation with the plaintiff. Likewise, the plaintiff denied having argued with A.M. In fact, the plaintiff testified that reports that he gave A.M. drugs to sell, and that they fought over money from the sale were a lie and untrue. Hence, the plaintiff never provided the School District, nor the police with any information that implicated A.M. in the incident (Defendant's CSMF at ¶¶ 59, 63 and Plaintiff's response thereto;

4

Defendant's appendix in support of its motion at pp. A. 73, 79, 82-84).

A.M. also agreed to and did submit to a drug test, which she passed. Sergeant Eve does not recall sharing any information about A.M.'s alleged selling of drugs with Sarandrea (Defendant's CSMF at ¶¶ 60-61 and Plaintiff's response thereto). At some point, however, Sarandrea and Eve did share notes (Plaintiff's CMF at ¶ 98 and Defendant's response thereto).

On February 28, 2007, E.P. met with Sarandrea and Eve, at which time he told them he witnessed the plaintiff sell thirteen (13) Oxycontin pills to E.M. in exchange for $18.00 (Id. at ¶ 104). With respect to such sale, E.P. asserted that E.M. paid for the pills with a roll of nickels. Sarandrea thought E.P. would not have reported that E.M. paid for the pills with a roll of nickels unless he actually saw it take place (Defendant's CSMF at ¶¶ 67-69 and Plaintiff's response thereto).

On February 28, 2007, Sarandrea met with another student, A.B., in the office. A.B. reported that E.M. told him the plaintiff had given her the pills. According to A.B, when he saw E.M. in the hall, she looked sick, whereupon she told him she had taken six or seven Oxycontin pills that she bought from the plaintiff during Period 6-7 (Id. at ¶¶ 53-55).

On March 7, 2007, E.M. died. Based on Sarandrea's investigation and reasonable suspicions, he concluded that the plaintiff had sold the pills to E.M. On March 12, 2007, Sarandrea sent a letter to Superintendent Gabriel, recommending that the plaintiff be permanently expelled from the School District for having provided Oxycontin pills to E.M. (Id. at ¶¶ 70-73). A.M. was not a suspect in the incident, and she was never disciplined for it (Plaintiff's CMF at ¶¶ 120-121 and Defendant's response thereto).

On March 21, 2007, an expulsion hearing was held (Defendant's CSMF at ¶ 74 and Plaintiff's response thereto). At the hearing, E.P. and A.B. both testified that the plaintiff sold

5

Oxycontin pills to E.M. which she ingested in school on February 27, 2007 (Defendant's appendix in support of its motion at pp. A. 273, 281-289, 307-309). The plaintiff did not testify at the expulsion hearing, nor did he present any additional witness testimony or documentation in his defense (Defendant's CSMF at ¶ 76 and Plaintiff's response thereto).

On April 10, 2007, the plaintiff was expelled from the School District. The plaintiff appealed the School Board's decision to expel him, but in an Opinion and Order dated August 24, 2007, the Court of Common Pleas of Lawrence County, PA upheld the plaintiff's expulsion (Id. at ¶¶ 77-79).

On or about June 7, 2007, a complaint was filed with the United States Department of Education, Office for Civil Rights ("OCR"), alleging that the School District discriminated against a black student on the basis of race (which clearly referred to the plaintiff), because he was treated differently than a white student (which clearly referred to A.M.) when both violated the School District's drug policy, as it expelled the black student, but not the white student. When OCR completed its investigation, it concluded that the evidence supported the School District's determination, and found that the District complied with its policies and procedures required for expelling a student, and that its actions were based on the established facts of what occurred on February 27, 2007 (Id. at ¶¶ 80-83).

Thereafter, the plaintiff completed his high school education at Great Challenges, and in June 2009, he graduated from the Union School District. He applied to two colleges, Indiana University of Pennsylvania ("IUP") and Penn State University, and he was accepted at both. The plaintiff elected to attend IUP, where he has a qualified grade point average of approximately 3.0 (Id. at ¶¶ 85-89).

Here, in his third amended complaint, the plaintiff contends that school officials

6

discriminated against him in violation of Title VI, by improperly investigating the matter and failing to question the involvement of other students, notably A.M., after which they falsely accused him of providing narcotics to E.M.; that the School District never accused A.M. of providing the narcotics at issue, even though the evidence against her was as strong as that against him; and that the School District conducted its investigation in a manner that ensured he would be accused in the incident, and it targeted him because of his race. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and 1343(a)(4).

The defendant has moved for summary judgment on the plaintiff's Title VI claim. A motion for summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F.R.Civ.P. 56(a).

A private cause of action under Title VI must be based on intentional discrimination. Alexander v. Sandoval, 532 U.S. 275, 280 (2001). In support of summary judgment, the defendant argues that based on the record in this matter, the plaintiff cannot establish a prima facie case of intentional race discrimination. It also asserts that even if the plaintiff could establish a prima facie case of discrimination, his claim would fail, because it had a legitimate non-discriminatory reason for expelling him.

A race discrimination claim under Title VI is analyzed under the three-stage shifting burden of proof articulated in McDonnell Douglas v. Green, 411 U.S. 792 (1973). See, Manning v. Temple University, 157 Fed. Appx. 509, 513 (3d Cir. 2005), citing Freeman v. Fahey, 374 F.3d 663, 666 (8th Cir. 2004). Under the McDonnell-Douglas framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).

7

To establish a prima facie case of Title VI discrimination in the educational context, a plaintiff must show that: (1) he is a member of a protected class; (2) he suffered an adverse action at the hands of the defendant in pursuit of his education; (3) he was qualified to continue in the pursuit of his education; and (4) he was treated differently from similarly situated students who are not members of the protected class. Manning v. Temple Univ., 2004 WL 3019230, *5 (E.D.Pa., Dec. 30, 2004), citing Bell v. Ohio State Univ., 351 F.3d 240, 252-53 (6th Cir. 2003); accord, Underwood v. La Salle Univ., 2007 WL 4245737, *6 (E.D.Pa., Dec. 3, 2007).

The defendant insists that the plaintiff cannot establish the fourth prong of his prima facie case, as he was not treated differently from similarly situated students who were outside the protected class. We disagree. "The burden of establishing a prima facie case of disparate treatment is not onerous." Burdine, 450 U.S. at 253. A plaintiff must prove by a preponderance of the evidence that he was subjected to an adverse action under circumstances which give rise to an inference of discrimination. Id.

Here, the plaintiff has created an inference of race discrimination by showing that the School District treated him less favorably than a white student, A.M., who also reportedly sold or gave pills to E.M. As recited above, a confidential informant, as well as another student, J.B., stated that they observed the plaintiff and A.M. arguing about how the plaintiff was going to get his money, after A.M. sold or gave some of the plaintiff's pills to E.M. (Plaintiff's CMF at ¶¶ 94-95 and Defendant's response thereto). Principal Sarandrea was aware that A.M. and the plaintiff reportedly had an argument, during which the plaintiff demanded that she give him his money. Sarandrea also knew that A.M. had previously purchased or been given drugs by the plaintiff. A.M. was questioned by Assistant Principal Razzano, but she was not a suspect, nor disciplined in the matter (Id. at ¶¶ 115-117, 120, 121). Based on these facts, the plaintiff has established a

8

prima case of discrimination.

In turn, the defendant has sustained its burden of production by presenting legitimate, non-discriminatory reasons for expelling the plaintiff and not A.M. following E.M.'s death. See, McDonnell-Douglas, 411 U.S. at 802. Specifically, the School District avers it had evidence that the plaintiff violated its Drug and Alcohol Policy by distributing a controlled substance to E.M. while on school property. Indeed, a student, A.B., informed Sarandrea that E.M. told him the plaintiff had given her the pills. Another student, E.P., advised Sarandrea that he witnessed the plaintiff sell pills to E.M., and that E.M. paid for them with a roll of nickels. In contrast, the defendant felt no discipline was warranted for A.M., as it did not have evidence that she violated its Drug and Alcohol policy (Defendant's CSMF at ¶¶ 54, 62, 67-68 and Plaintiff's response thereto; Defendant's appendix in support of its motion at pp. A. 381-383, 415-419).

At this juncture, it is incumbent upon the plaintiff to satisfy his ultimate burden of persuasion by producing evidence that the defendant's articulated reason for expelling him was a pretext for discrimination. Id. at 804-05. The plaintiff may meet this burden by submitting evidence

> from which a factfinder could reasonably either (1) disbelieve the [defendant's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the [defendant's] action.

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

To establish pretext under the first prong of the Fuentes standard, the Third Circuit Court of Appeals has stated: "the plaintiff cannot simply show that the [defendant's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the [defendant]". Jones v. School Dist. of Philadelphia, 198 F.3d 403, 413 (3d Cir. 1999).

9

Rather, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Id. "[A] plaintiff may satisfy this standard by demonstrating, through admissible evidence, that the [defendant's] articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been [its] real reason." Id.

To survive summary judgment under the second prong of the Fuentes standard, a plaintiff may show pretext by "pointing to evidence in the record which allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse … action." Jones, 198 F.3d at 413. For instance, a plaintiff may show that a defendant has treated similarly-situated persons not within the protected class more favorably. Id.

Here, the plaintiff has not proffered evidence of pretext. That is, he has not shown that the defendant's investigation was biased, or that its reason for expelling him and not A.M. -- because it had evidence that the plaintiff violated its Drug and Alcohol Policy -- is unworthy of credence.

In pertinent part, the School District's Drug and Alcohol Policy "prohibits students from using, possessing, distributing, and being under the influence of any drugs or alcohol during school hours, on school property, and at any school-sponsored event." (Defendant's appendix in support of its motion at p. A. 367). Following the School District's investigation into E.M.'s drug overdose, Principal Sarandrea concluded -- for reasons discussed below -- that the plaintiff had provided Oxycontin pills to E.M. Thus, on March 12, 2007, Sarandrea sent a letter to Superintendent Gabriel recommending that the plaintiff be permanently expelled for such act (Defendant's CSMF at ¶¶ 71-73 and Plaintiff's response thereto).

As to the plaintiff, the record shows that he was interviewed by Sarandrea on February 27, 2007, the day of E.M.'s drug overdose. Sarandrea selected the plaintiff and two other students -- E.P. and B.R. -- to question, because he saw from a seating chart that they sat in close proximity to E.M. and were friends or acquaintances with her. Sarandrea questioned them in the presence of Police Sergeant Eve. After questioning the students, Sarandrea let them go home (Id. at ¶¶ 29-31, 39).

On February 27, 2007, Sergeant Eve interviewed other students about the incident, including J.B. and a confidential informant (Plaintiff's CMF at ¶¶ 90, 93 and Defendant's response thereto). On that day, Eve received information about the plaintiff from the confidential informant that was used to get a search warrant to check the plaintiff's house. The confidential informant told Eve that the plaintiff sold Oxycontin to E.M. two weeks before the incident. Sergeant Eve interviewed the plaintiff that evening after obtaining the search warrant, and the plaintiff admitted giving pills to E.M. a week earlier (Defendant's CSMF at ¶¶ 47, 48, 52 and Plaintiff's response thereto).

On February 28, 2007, E.P. met with Sarandrea and Eve and told them he saw the plaintiff sell 13 Oxycontin pills to E.M. in exchange for $18.00 on the day of the incident (Plaintiff's CMF at ¶ 104 and Defendant's response thereto). Sarandrea met with another student that day, A.B., who reported that E.M. told him the plaintiff had given her the pills (Defendant's CSMF at ¶¶ 53-54 and Plaintiff's response thereto). At some point in time, Sarandrea and Sergeant Eve shared notes (Plaintiff's CMF at ¶ 98 and Defendant's response thereto).

With respect to A.M., a white student at the High School, J.B. informed Eve on February 27 that the plaintiff and A.M. were arguing about how the plaintiff was going to get his money, because A.M. sold pills to E.M. for more money. The confidential informant also reported

11

observing the plaintiff and A.M. arguing, as A.M. had given some of the plaintiff's pills to E.M. without receiving payment for them (Id. at ¶¶ 94-95).

Importantly, no one saw A.M. give or sell drugs to E.M. In contrast, E.P. told Sarandrea that he saw the plaintiff sell 13 Oxycontin pills to E.M. Another student, A.B., informed Sarandrea that E.M. told him the plaintiff had given her the pills. Nonetheless, when Assistant Principal Razzano and Sarandrea became aware that A.M. and the plaintiff reportedly had a verbal confrontation in which the plaintiff demanded that A.M. give him his money, Razzano interviewed A.M. (Defendant's CSMF at ¶¶ 56-57 and Plaintiff's response thereto). Razzano interviewed A.M. because he had a close relationship with her, having worked through some personal matters with her in the past. Razzano informed Sarandrea that A.M. had previously purchased or been given drugs by the plaintiff (Plaintiff's CMF at ¶¶ 116-117 and Defendant's response thereto).

As discussed above, the School District's Drug and Alcohol Policy prohibits students from "using, possessing, distributing, and being under the influence of any drugs or alcohol during school hours" (Defendant's appendix in support of its motion at p. A. 367). In this instance, A.M. agreed to and did submit to a drug test, which she passed. A.M. also denied having a confrontation with the plaintiff. Similarly, the plaintiff denied having the reported argument with A.M. (Defendant's CSMF at ¶¶ 59-60, 63 and Plaintiff's response thereto).

Based on these facts, we cannot say that the School District conducted a biased investigation into the matter or treated A.M. more favorably than the plaintiff. Since E.P. witnessed the plaintiff selling Oxycontin pills to E.M on the day of her drug overdose, and as E.M. informed A.B. that she had gotten the pills from the plaintiff, the School District had evidence that the plaintiff violated its Drug and Alcohol Policy. Conversely, since no one

witnessed A.M. sell or give drugs to E.M., and as both A.M. and the plaintiff denied reports that they argued over money from the sale of drugs to E.M., and as A.M. passed a drug test, the defendant's claim that no discipline was warranted for A.M. is not a pretext for discrimination.[3]

In further hopes of showing pretext, the plaintiff questions the fact that E.M. had 13 pills in her purse following her drug overdose, after he allegedly sold her 13 pills that day, and she ingested 6 or 7 of them. According to the plaintiff, this creates an issue because E.M. had more pills than the ones he is said to have sold her.

Clearly, these facts do not demonstrate pretext. First, they fail to show that the defendant's stated reason for expelling the plaintiff and not A.M. is unworthy of credence, as it had evidence that the plaintiff, not A.M., violated its Drug and Alcohol Policy. Second, the fact that E.M. had 13 pills in her purse after reportedly buying 13 pills from the plaintiff and ingesting 6 or 7 of them on February 27, 2007, does not implicate A.M., nor prove that the defendant's investigation was biased. As discussed above, unlike the case with the plaintiff, no one witnessed A.M. sell or give drugs to E.M. Further, both A.M. and the plaintiff denied reports that they argued over money from the sale of drugs to E.M. In fact, the plaintiff admits that he never provided the School District, nor police with any information that implicated A.M.

---

[3] Indeed, after OCR conducted its investigation into the aforementioned race discrimination complaint brought on behalf of a black student who attended the High School (which clearly referred to the plaintiff and pertained to his expulsion after E.M.'s death), OCR issued a letter determination dated October 2, 2007, concluding that there was insufficient evidence to support a finding of a Title VI violation. In its letter determination, OCR explained that in the course of its investigation, the plaintiff identified three white students who allegedly violated the School District's drug policy without being disciplined, but for two of the students, the plaintiff provided no factual support for his accusations; thus, OCR ruled that the black student, i.e., the plaintiff, did not provide a sufficient factual basis to support his claim that he was treated differently than them. The third student identified by the plaintiff, a white female (which clearly referred to A.M.), was interviewed by OCR and identified as "Student D" in its letter determination. OCR determined there was insufficient evidence to establish that Student D, i.e. A.M., violated the School District's drug policy, as she submitted to a drug test, the results of which were negative, no witness could substantiate a drug transaction involving Student D and any other student, and no such evidence appeared on school surveillance video tapes. Thus, OCR concluded that Student D was not disciplined because there was no evidence showing she violated the District's drug policy. See, Defendant's appendix in support of its motion at pp. 415-419.

in the incident (Defendant's CSMF at ¶¶ 59, 63 and Plaintiff's response thereto; Defendant's appendix in support of its motion at pp. A. 83-84).

However, there are facts that could account for the extra pills in E.M.'s purse. As previously mentioned, on February 27, 2007, the confidential informant told Sergeant Eve that the plaintiff sold Oxycontin pills to E.M. two weeks before the incident. Eve interviewed the plaintiff that evening after obtaining a search warrant, and the plaintiff admitted giving pills to E.M. a week earlier (Defendant's CSMF at ¶¶ 47-48, 52 and Plaintiff's response thereto). Thus, the pills which the plaintiff gave to E.M. a week earlier, or the Oxycontin pills that he allegedly sold her two weeks before the incident could account for the additional pills in E.M.'s purse.

In any event, the plaintiff has not met his burden of demonstrating that the School District treated similarly-situated persons not within the protected class more favorably, or that its actions in this matter were a pretext for discrimination. Therefore, since no genuine issue of material fact is in dispute, and for reasons discussed above, the defendant's motion for summary judgment (Document No. 42) should be granted.

Within fourteen (14) days after being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

                              Respectfully submitted,

                              s/ ROBERT C. MITCHELL
                              United States Magistrate Judge

Dated: February 18, 2011